UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------x

UNITED STATES OF AMERICA,                             **Docket No:**
                                                      **17-CR-585(JS)**

                           Plaintiff,

v.

HAROLD BENDELL,

                           Defendant.
---------------------------------------------------------------------------X


# SENTENCING MEMORANDUM
# ON BEHALF OF HAROLD BENDELL


**HARFENIST KRAUT & PERLSTEIN, LLP**
*Attorneys for Defendant Harold Bendell*
3000 Marcus Avenue, Suite 2E1
Lake Success, New York 11042
P. (516) 355-9600
F. (516) 355-9601

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ i

PRELIMINARY STATEMENT ..................................................................................... 1

I.      BACKGROUND FACTS RELATING TO OFFENSE CONDUCT .................................. 3

II.     THE PLEA AGREEMENT AND OBJECTION TO THE PRESENTENCE
REPORT ............................................................................................................... 5

III.    THE SECTION 3553(a) FACTORS FAVOR A DOWNWARD VARIANCE
OF A NON-CUSTODIAL SENTENCE ...................................................................... 8

       A.     Harold's History and Characteristics ................................................... 10

              1.     Harold's Family Life and Value System .................................... 11

              2.     Social Work Within the Bronx Community ................................. 13

                      a.    Empowering Students through Education ..................... 13
                      b.    Automotive Education ................................................. 14
                      c.    NYPD Law Enforcement Explorers Program ............... 16
                      d.    The Church of Sts. Philip and James Charity Work ..................... 17

       B.     A Sentence of Probation Would be "Sufficient, But Not Greater
Than Necessary" ............................................................................... 19

              1.     Harold's Extraordinary Acceptance of Responsibility ............... 20

       C.     The Need to Avoid Unwarranted Sentencing Disparity ........................ 24

CONCLUSION .......................................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**

*Gall v. United States*
522 U.S. 38, 52 (2007) ............................................................................................ 8, 18

*Kimbrough v. United States*
552 U.S. 85 (2007) ...................................................................................................... 8

*Spears v. United States*
555 U.S. 261 (2009) .................................................................................................... 8

*United States v. Adelson*
441 F.Supp.2d 506, 513-514 (S.D.N.Y. 2006) ....................................................... 10

*United States v. Booker*
543 U.S. 220 (2005) ........................................................................................... *passim*

*United States v. Calcagno*
No. 5-cr-298 (E.D.N.Y) ........................................................................................... 27

*United States v. Campbell*
765 F.3d 1291, 1300 (11th Cir. 2014) ..................................................................... 19

*United States v. Cavera*
550 F.3d 180, 189 (2d Cir. 2008) .............................................................................. 9

*United States v. Cottingham*
318 Fed.Appx. 159, 162 (4th Cir. 2008) ................................................................. 19

*United States v. Doe*
398 F.3d 1254, 1260–61 (10th Cir. 2005) ............................................................... 22

*United States v. Frank*
No. 11-cr-820 (E.D.N.Y.) ........................................................................................ 26

*United States v. Kouzios*
No. 15-cr-0065 (E.D.N.Y) ................................................................................. *passim*

*United States v. Landrón–Class*
696 F.3d 62, 77–78 (1st Cir. 2012) .......................................................................... 22

*United States v. Leiskunas*
656 F.3d 732, 737 (7th Cir. 2011) ........................................................................... 22

*United States v. Massey*
663 F.3d 852, 858 (6th Cir. 2011) ........................................................................... 22

*United States v. Mattarella*
No. 98-cr-309 (E.D.N.Y.) ........................................................................................ 28

*United States v. Olenicoff*
No. 7-cr-227 (C.D.Cal.) ...................................................................................... 10, 28

*United States v. Orsaris*
No. 10-cr-232 (E.D.N.Y. 2013) ................................................................................ 5

*United States v. Petrelli*
306 F. Supp. 2d 449, 451 (S.D.N.Y. 2004) ............................................................. 21

*United States v. Quinn*
No. 10-cr-327 (E.D.N.Y.) ................................................................................... 26, 27

*United States v. Robinson*
741 F.3d 588, 600 (5th Cir. 2014) ........................................................................... 22

*United States v. Schuster*
No. 01 Cr. 67, 20002 WL 31098493 (S.D.N.Y. Sept. 19, 2002) ........................... 20

*United States v. Serafini*
   233 F.3d 758, 762, 773-74 (3d Cir. 2000)................................................................. 18
*United States v. Shin*
   No. 12-cr-182 (E.D.N.Y.) ....................................................................................... 27
*United States v. Shockler*
   No. 12-cr-415 (E.D.N.Y.), 2013 WL 4851695 (E.D.N.Y. Sept. 10, 2013) ...................... 25, 26
*United States v. Singh*
   No. 13-cr-408 (E.D.N.Y.) ..................................................................................... 27, 28
*United States v. Thurston*
   544 F.3d 22, 26 (1st Cir. 2008) ................................................................................ 19
*United States v. Tomko*
   562 F.3d 558, 563 (3d Cir. 2009)............................................................................... 18
*United States v. Urena*
   425 Fed.Appx. 6, 9 (2d Cir. 2011) .............................................................................. 9
*United States v. Warner*
   No. 13-cr-731 (N.D.Ill.) ........................................................................................ 9, 28
*United States v. Weisberg*
   297 Fed. Appx. 513 (6th Cir. 2008) ............................................................................ 19

**Statutes**
18 U.S.C. § 3553(a) ......................................................................................... *passim*
26 U.S.C. § 7206................................................................................................ *passim*

**United States Sentencing Guildines**
§ 2T4.1 ............................................................................................................... 6
§ 3E1.1 ............................................................................................................. 21

**Other Authorities**
*Playboy Car Dealer Gets 7 Years for Stealing Million*
   New York Post, Dec. 18, 2013............................................................................... 5

## PRELIMINARY STATEMENT

Harold Bendell ("Harold"), almost 71 years old, is before the Court for sentencing on his plea to a single count Information charging him with a violation of 26 U.S.C. § 7206(2) and 18 U.S.C. § 2 for aiding and assisting in the filing of a false corporate tax return.

This case is based upon tax violations occurring almost 10 years ago. Harold has pleaded guilty as a result of paying a former manager Chris Orsaris ("Orsaris") of the Major Automotive Companies, Inc., ("MAC"), as an independent contractor, as opposed to an employee. This mischaracterization caused MAC to underreport its' payroll taxes. Harold also has paid restitution beyond this tax loss to cover other disputes with the IRS.

First, the unique circumstances of this case, including the Bendells' extraordinary acceptance of responsibility, warrant a non-custodial sentence. Harold and Bruce have: 1) paid restitution, in full before pleading, exceeding the agreed upon offense conduct to cover other tax disputes and paying at  rate higher than that would have been paid by MAC and Orsaris; 2) at the request of the Government, hired FTI Consultants, to conduct a forensic examination of MAC as to certain transactions under question by the IRS; and 3) divested themselves of ownership and control of MAC at the request of the Government. These highly unusual actions warrant the Court imposing a non-custodial sentence.

While the requested sentence is a downward variance from the discretionary guidelines, an analysis of the factors in Title 18, Section 3553(a) warrant such a sentence. Beside the extraordinary acceptance of responsibility by Harold and Bruce, Harold is tremendously remorseful over his offense. See, Ex. A. He understands that his tax violation is not something to be taken lightly and is anguished over his wrongdoing. Harold will live with the shame of his actions for the rest of his life.

1

Harold, who now spends around half the year living in Puerto Rico, consults with Major World Acquisition ("MWA") under the agreements that divested him from MAC, by buying used cars for MWA through a small consulting company in Puerto Rico. This small consulting company would fold if Harold were incarcerated.

While Harold accepts responsibility and is extremely remorseful for his wrongdoing, his offense conduct (paying a former employee as an independent contractor instead of an employee) is rarely the subject of criminal prosecution and virtually always addressed through civil fines imposed by regulatory authorities.

Second, the other "schemes" identified in the PSR were not subject to Harold's criminal plea agreement with the Government despite Harold and Bruce agreeing to pay restitution for them. The purported "schemes" raise serious questions about whether the conduct caused any tax loss, was criminal, or supported by anything but extrapolation premised on speculation. The PSR's inclusion of these unproven "schemes" as relevant conduct is simply wrong. Rather, these were legitimate disputes resolved by payment outside the criminal plea.

As to the cash payments received from Esquire Insurance, Harold included the cash on his tax returns and paid income tax on his share that he received from Orsaris. The PSR's claim that Harold and Bruce allowed MAC to pay Orsaris's personal American Express charges is false. Orsaris pleaded guilty to stealing this money from MAC and was ordered to make restitution to MAC.

The "check swapping" claim is premised on extrapolation and the "professional judgment" of FTI, making it based on speculation and not mathematical certainty. And no tax loss was caused by MAC paying expenses of other entities owned by Harold and Bruce since they were legitimate business expenses which would have been deducted by those entities if they

had paid them. These categories of transactions were resolved through the restitution because serious question over the validity of them existed.

Finally, a sentence of probation is appropriate because anything more severe would be disproportionate to sentences imposed in this District, and in other jurisdictions around the country, for defendants convicted of similar offenses.

Many cases exist in which non-custodial sentences have been imposed in similar circumstances to this one. Indeed, this case presents features that many others cannot - Defendant's incurring substantial expense in assisting the Government's investigation, divesture from their operational and ownership control over the company that they created and ran, and full payment of restitution before pleading guilty.

Under the totality of circumstances, the Court should sentence Harold to a non-custodial sentence.

## I.      BACKGROUND FACTS RELATING TO OFFENSE CONDUCT

The offense conduct here stems from decisions and actions that Harold and his brother Bruce made over a decade ago. From 2007 until about 2009, Bruce and Harold employed a manager named Chris Orsaris at their flagship dealership, Major World, in Long Island City, New York. Harold who ran the operations at Major World, had identified Orsaris as a protégé, someone he was grooming to become a potential future owner of the dealership. This decision would prove to be a colossal error in judgment. During this time, Orsaris was a highly valued and trusted employee.

Orsaris's wife also worked as a consultant to Major World. She was paid as an independent contractor through a company she owned. After her relationship with Major World ended, Orsaris asked Harold if most of his compensation could be paid to the corporate entity that his wife had

used rather than to him directly.

Because of this decision, the IRS Form W-2 prepared by MAC for Orsaris did not accurately reflect all of the taxable income that he earned as an employee of Major. As the bulk of the compensation that Orsaris received from Major World was paid to Orsaris's corporate entity, Harold caused Major World to issue IRS Form 1099s to Orsaris's corporate entity for monies that Orsaris earned as an employee. Because of this decision, no payroll taxes were withheld from the payments made to Orsaris' corporate entity. Orsaris apparently paid no self-employment tax on this money.

As a result of an agreement that Orsaris arranged with an insurance broker, the Esquire Agency, cash payments were made to Orsaris. He shared the cash payments he received from the Esquire Agency with Harold, who in turn shared a portion of them with Bruce.

Sometimes Harold used the Esquire Agency cash payments he received to make unrecorded compensation payments to certain employees of Major World. This practice caused Major World to issue inaccurate IRS Form W-2s for these employees and again underpay Major World's payroll tax obligations.

Unknown to Harold and Bruce, however, Orsaris was using his position and influence at Major World to embezzle money from the dealership on a grand scale. Part of his thievery included charging large personal expenses on Major World's corporate American Express account and disguising these charges as business expenses to obtain reimbursement from Major World. In this way, Orsaris began funding an extravagant lifestyle.

It was not until 2010 that Orsaris's multimillion-dollar embezzlement scheme, along with an unrelated insurance fraud scheme, was discovered. Orsaris was eventually prosecuted by federal law enforcement authorities. Ultimately, Orsaris received a sentence of 85 months imprisonment

and was ordered to pay restitution of approximately $14 million to MAC. *See United States v. Orsaris,* Crim. No. 10-CR-232 (E.D.N.Y 2013) (Wexler, J.); See, Ex. B; *see also Playboy Car Dealer Gets 7 Years for Stealing Millions,* New York Post (Dec. 18, 2013).

## II.     THE PLEA AGREEMENT AND OBJECTION TO THE PRESENTENCE REPORT

Under the Plea Agreement, Harold's Total Offense Level should be 18. This Agreement resulted from almost 6 years work with the U.S. Attorneys' Office.

The structure of the Plea Agreement, which encompasses both a criminal and civil component, is essential to understanding how the defendants and the Government came to this resolution. The Plea Agreement includes as restitution claims of tax disputed by the parties over whether they stemmed from criminal conduct. To resolve the case, the parties agreed to include these disputed calculations in the restitution total.

The distinctions between how the six categories of conduct listed in ¶12 of the PSR were treated by Harold and Bruce and the Government are critical to understanding how the parties came to the Plea Agreement. First, the criminal conduct here involves only: (i) the improper payments to Orsaris's corporate entity; and (ii) other cash compensation payments made to Major World employees. This conduct, which formed the basis of the guilty plea, caused MAC to file inaccurate IRS Form W-2s and Form 1099s for these employees. The tax loss for this conduct is itemized in Attachment A of the Plea Agreement. Second, to resolve other tax disputes (and therefore not "relevant conduct"), the parties agreed to include additional monies as part of the restitution.

The PSR rejects the Plea Agreement structure. Instead, it wrongly treats both the criminal guidelines component and *all* of the restitution component as relevant conduct. This resulted in a total offense level of 21, calling for a guideline range of 37-46 months imprisonment. As the

statutory cap for the offense is 36 months, Probation recommended a sentence of the statutory maximum.

The PSR is riddled with errors identified in Harold's Objections attached as Appendix No. 1. While many of the factual conclusions reached in the PSR are unsupportable by the circumstances surrounding this case, the attempts to justify the loss calculation are perhaps most problematic because they paint a picture of the transactions and the Plea Agreement which is not accurate. Although addressed in the objections to the PSR, how the categories of claimed loss were disregarded by the parties is so significant. They are worthy of being repeated.

First, the criminal conduct in this is case, the improper payments to Orsaris's corporate entity and other cash compensation payments made to Major World employees, which formed the basis of the guilty plea, caused Major World to file inaccurate IRS Form W-2s and Form 1099s for these employees. The tax loss for this conduct is itemized in the two rows of the chart in ¶12 entitled "Commission Payments to Orsaris's Companies," and "Cash or Unreported Employee Compensation" When the figures in these rows are totaled and multiplied by 28% (income tax rate), the resulting sum is $1,384,433.40. That number corresponds to the "Employment Tax" chart total in Attachment A "Restitution," on page 8 of the Plea Agreement. This number also supports the Tax Loss Guideline range of greater than $550,000 but less than $1,500,000, *see* § 2T4.1(H), that the parties stipulated on page 3 of the Plea Agreement.

Second, to resolve what Harold and Bruce believe are non-criminal tax disputes (and therefore not "relevant conduct"), the parties agreed to include additional monies as part of the restitution matter. The remaining four "Categories of Loss" listed in ¶12 of the PSR ((1) American Express charges; (2) Esquire kickbacks; (3) Unreported checks; (4) Public versus Private expenses) form the basis of this calculation.

The American Express charges (of which Harold did not know about) were thefts by Orsaris for which he was prosecuted and agreed to pay restitution. See Ex. C. These were not "knowing" transactions condoned by Harold, as Probation claims.

As to Esquire Payments, Harold recorded the cash he received from Orsaris on his personal tax returns. See, Ex. C.

The "Public versus Private Expenses" category yields no discernable tax loss because there is no dispute that the expenses were legitimate business expenses which the other entity deducted.

Finally, the category, "Unreported Checks" could not be calculated with any real accuracy. See, Ex. D. This category was excluded from the criminal loss calculation since it was based in part on "professional judgement" and "extrapolation."

If these four categories are summed and multiplied by 28% (tax rate), the total is $1,388,622.  This figure corresponds to the additional restitution in the "Corporate Income Tax" chart on Attachment A (pg. 8) to the Plea. Showing the intent of the parties to treat this number separately from the criminal tax loss, this figure is not included in the Base Offense Level calculation contained on page 3 of the Plea Agreement.

The Court should note that the employment tax figures here use a 28% personal income tax rate. Yet this would not be the tax paid by MAC if Orsaris would have been correctly treated as an employee as opposed to an independent contractor. That rate would be 15.3%. The use of the higher percentage was part of the negotiation of the Plea Agreement.

Probation's claims as to the guideline loss and restitution numbers ignores the Plea Agreement and does not consider the dramatic differences in the categories assigned by the parties. As a result, the PSR should be revised to follow the tax loss calculation in the Plea Agreement.

### III.    THE SECTION 3553(a) FACTORS FAVOR A DOWNWARD VARIANCE OF A NON-CUSTODIAL SENTENCE

The Supreme Court has encouraged sentencing courts to exercise great discretion in imposing a just and fair sentence. *See, e.g.,*, *Spears v. United States*, 555 U.S. 261 (2009); *Kimbrough v. United States*, 552 U.S. 85 (2007); *United States v. Booker*, (2005).

In the post-*Booker* era, the sentencing court's duty is to consider all the factors identified in 18 U.S.C. § 3553(a) and "impose a sentence sufficient, but not greater than necessary" to comply with the four purposes of sentencing set forth in the statute. Following *Booker*, district courts must impose a sentence in accordance with the factors set forth in 3553(a), of which the advisory United States Sentencing Guidelines "now serve as one fact among several [that] courts must consider in determining an appropriate sentence." *Kimbrough*, 552 U.S. at 90.

In imposing sentence, § 3553 requires the sentencing court to consider the following factors (in addition to the advisory Guidelines range and any pertinent policy statements issued by the Sentencing Commission) in imposing a sentence: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the kinds of sentence available; (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to any victims of the offense. 18 U.S.C. 3553(a)(1)-(7).

Under § 3553, the advisory Guideline range receives no presumption of reasonableness, nor does any presumption of unreasonableness attach to a sentence that varies from the Guideline range. *See Gall v. United States*, 522 U.S. 38, 52 (2007)("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.").

The Court "may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors [under § 3553(a)], aided by the arguments of the prosecution and defense." *See United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008).

A downward variance from the Sentencing Guidelines is neither presumed to be unreasonable nor does it require "extraordinary circumstances." *See United States v. Urena*, 425 Fed.Appx. 6, 9 (2d Cir. 2011).

In this situation, full consideration of the § 3553(a) factors warrant a variance to a non-custodial sentence. When the unique circumstances of this case are viewed within the prism of sentences for similar crimes by individuals whose cases had some, but not all, of the personal history, extraordinary acceptance of responsibility and other characteristics of this matter, it should become apparent to the Court that Harold should receive a non-custodial sentence.

Harold is extremely remorseful for and does not take lightly his tax offense. (See, Ex. A). He is "nervous" about what will happen to his family and the employees in Puerto Rico.[1] He has suffered collateral consequences from his plea, such as the inability to hold a NYC Department of Consumer Affairs Second Hand Dealer's license.

While Harold's crimes are inexcusable, put into context, a criminal tax violation of this type is uncommon compared to other tax evasion schemes, such as those involving tax preparers who operate false tax return mills, or schemes involving substantial personal tax avoidance. Even in those circumstances, non-custodial sentences have been deemed appropriate. *See, e.g.*, *United*

---

[1] The PSR, in seeking to justify a long incarceration for a 71 year old man who went well beyond the ordinary defendant working with the Government for someone not receiving a 5K request, claims that nothing will happen to Harold's consulting business and two employees in Puerto Rico. Contrary to this factually unsupported claim, for which Probation has no basis, Harold's incarceration will cause the two employees to lose their jobs.

*States v. Warner*, Case No. 13-cr-731 (N.D.Ill.) (Defendant, who received sentence of probation, concealed over $20 million in income and assets held overseas, leading to tax loss of $5.5 million); *United States v. Olenicoff*, Case No. 7-cr-227 (C.D.Cal.) (Defendant convicted for violating § 7206(1) with $52 million civil tax liability sentenced to probation).

Here, Harold pleaded guilty to causing MAC to file a false tax return due to the treatment of Orsaris as an independent contractor, as opposed to an employee. As a result of this treatment, Orsaris failed to pay employment tax causing a tax loss to the Government. But one of the few correct statements in the PSR about the transactions in issue is that this tax treatment mainly benefited *Orsaris* as opposed to Harold, Bruce or MAC.

**A.     Harold's History and Characteristics**

Explaining the importance of a defendant's history and characteristics as a sentencing consideration, Judge Rakoff wrote:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'

*See United States v. Adelson*, 441 F.Supp.2d 506, 513-514 (S.D.N.Y. 2006).

As will be seen, the early parts of Harold's life were not easy, but Harold overcame those challenges. In many respects, he became a father figure to Bruce. These early familial difficulties did not deter Harold who has certainly been successful. But, more importantly, he has not forgot from where he came. His charitable efforts to underprivileged individuals encompass both contributions based on his economic success and substantial donations of his time and skills to those less fortunate.

**1.      Harold's Family Life and Value System**

Harold was born in 1948 in a refugee camp in Wetzlar, Germany.  His parents, Joseph and Manya, Holocaust survivors, moved the family to Brooklyn in 1949.

Manya tragically died of a hemorrhage when Harold was 6 years old, leaving Harold to help his father care for his two younger brothers, Jerry and Bruce. A few years later, Joseph married Harold's step-mother, Ruth. Harold did not enjoy a close relationship with his step-mother, so he spent much of his free time working odd jobs after school and on the weekends to contribute to the family.

Sadly, Harold's brother Jerry contracted polio. After a long bought with depression, he took his own life at the age of 21. Harold's cousin, Dr. M. Daniel Nienaltow, recalls how in the wake of that tragedy Harold "provided exquisite, loving care and support to extraordinarily grief-stricken brother and parents, demonstrating great strength and loving compassion to all." (Ex. E at HB14-16).

Luckily, surviving a childhood filled with grief, disappointment and hardship did not ruin Harold. Instead, it molded him into a thoughtful, generous and humble family man. These qualities are reflected in the letters submitted to this Court by Harold's family, friends and acquaintances. (Ex. E at HB1-HB45)

Harold's step daughter, Nicole Markson, lovingly describes how Harold immediately bonded with her when they first met, slipping cookies in her coat pocket so she would have a surprise and spending time playing with her. (Ex. E at HB18-HB22) Harold felt especially dedicated to gaining Nicole's trust and respect because he knew from his own experience how upsetting to a child the intrusion of a new person into a family's life can be.   As an adult Nicole recognizes how special Harold's careful attention was poignantly writing "Because my natural

father wasn't involved, [Harold] became what I might have never had. He took an interest in me" (Ex. E at HB18-HB21).

As Nicole grew, Harold married her mother, Anne. Eventually, they became a family of five with the birth of Harold and Anne's daughters, Chelsea and Skye. All three of Harold's daughters recall that despite Harold's busy work schedule, he always made time to come to every school event, with a video camera to record all those special moments. (Ex. E at HB17-HB24) Despite working long hours, his daughters never felt his absence and all three girls think of him as a role model in life and parenting. (Ex. E at HB17-HB24). Harold's friend Rita Moffett Greenberg observes Harold's absolute devotion to his family: "His children and grandchildren adore him, and it is because he is always there for them." (Ex. E at HB11) Chelsea recalls Harold driving her to the hospital on the morning her twin daughters were born and Nicole remembers her step father being the first visitor in her hospital room at 7:00 AM the morning after her daughter was born. (Ex. E at HB17-HB22)

For Harold, his role as a parent and grandparent is the most important thing in life, encouraging his granddaughters to FaceTime him when they wake up and being "on call" for his daughters and granddaughters all the time, even when in Puerto Rico. (Ex. E at HB17-HB22) Nicole describes Harold as the quintessential grandfather, "funny, warm and want[ing] to share his knowledge and life experience" with his granddaughters.

Harold's kindness and willingness always to be there for others extends even beyond strict relations to his friends and employees. Harold's friend, Pam Gimella, recalls that when her 10-year-old daughter got sick visiting her grandmother in Florida, Harold volunteered to bring her home. (Ex. E at HB30) Ms. Gimella remembers how relieved and grateful she was when Harold emerged from JFK airport carrying her ailing daughter bundled in a blanket. (Ex. E at HB30)

After Hurricane Maria devasted Puetro Rico, Harold continued to pay his employees there even though structural damage prevented the office from reopening for over six months. (Ex. E at HB36-HB37). Employee Carmen Lugo expresses her gratitude to Harold for sending her family supplies like water, candles, flashlights and batteries after the storm. (Ex. E at HB36). Evelyn Nieves believes Harold "treated us like family" and is "grateful to have come across such a Caring Employer and Special Individual." (Ex. E at HB37)

Put simply, the heartache of losing their mother and brother Jerry not only brought Harold and Bruce closer to each other but strengthened Harold's devotion to family and loved ones.

### 2.    Social Work Within the Bronx Community

#### a.    Empowering Students through Education

Unlike many philanthropists who sit on boards and simply write checks, Harold has donated his time and experience as a middle school math teacher in Bedford Stuyvesant to create a tutoring program for students in the Gun Hill section of the Bronx.

Around 8 years ago, Harold decided to set up a free math tutoring program in the empty building next to Toyota dealership he owned with his brother. With no fanfare, Harold simply hung up a sign in the window of the dealership on Boston Road inviting any local students that needed math help to come after school.

Peter Contreras, a long-time employee and friend, remembers Harold being both pleased and overwhelmed that first day when about 15 middle schoolers showed up and Harold sought to tutor them all…..by himself. (See Ex. E at HB1). Once Harold realized how many local students needed math help, he recruited a team of  teachers, including Rich and Becky Meyer, to help run the tutoring program. (See Ex. E at HB32-HB35). Harold has continued to spend several hours a week at the tutoring center whenever he is in the United States. Pictures of students studying at the

center are submitted as Ex. E at HB46-HB47.

One student in particular has a special success story from Harold's tutoring. Lucy Zillito was struggling to complete her GED. Ms. Zillito met Harold through her job at Hagedorn Communications, a newspaper printing company in New Rochelle, New York. When Ms. Zillito was asked to print an advertisement about Harold's math tutoring program, she asked if she could attend his classes. Harold agreed to set aside 4-5 hours every Tuesday for several years to tutor Ms. Zillito. After a few failed attempts, Ms. Zillito finally passed the Common Core GED in 2015. Encouraged by her accomplishment, Ms. Zillito continued her education and in 2017 graduated from Monroe College with an associates degree in medical administration. (See Ex. E at HB31) Many of Harold's friends recall how overwhelmingly proud Harold was of Ms. Zillito's accomplishments, highlighting his caring nature (Ex. E at HB1, HB11 and HB25).

Harold continued to tutor kids personally until mid-2014 when he began to spend about 6 months of the year in Puerto Rico after divesting himself of an operating role in MAC.

### b.    Automotive Education

Harold has combined his passion for education with his thirty plus years' worth of automotive industry knowledge to help CUNY Bronx Community College, Brookdale Community College and the New York City Department of Education improve their automotive technology programs. These associates of arts programs are designed to prepare students for careers in many automotive industry positions, including automotive technician, diagnostician, equipment sales and service, dealership service manager, service writer and engine machinist.

Harold's efforts to promote quality training and education for people pursuing careers in the automotive industry include weekly appearances on the Consortium for Automotive

Education's ("CAED") radio broadcast. For over thirty years Harold has joined the CAED[2] broadcast and answered thousands of questions about the industry for students. Professor Harold Wolchok praises Harold's efforts to support the CAED, noting that Harold has appeared on the radio broadcast for two hours almost every week for over thirty years. (Ex. E at HB43-HB44)

As many of Harold's employees note, his dedication and joy in helping others succeed professionally is a source of inspiration. Almost twelve years ago, Nenad Mikovic, an Eastern European immigrant with virtually no automotive industry experience, was offered a chance to work for Harold.  Mr. Mikovic notes that "[a]s a newbie, I needed a boss to invest time to simplify [the] complexities [of the industry] so that my daily activities made sense with a purpose."   Under Harold's dedicated tutelage, Mr. Mikovic is now the Service Manager at Major World.  Everyday Mr. Mikovic approaches his staff with the same compassion and guidance he learned from Harold. (Ex. E at HB3-HB4). Mr. Mikovic describes Harold as having "a visionary scale that inspired others and myself to achieve their hopes and goals while working alongside [them] to make this happen." (Ex. E. at HB3-HB4).

Irina Danilevskaia, director of Major World's overseas department credits Harold with helping her to start her career. (Ex. E at HB2). Twenty-five years ago, Harold gave Ms. Danileskaia, an immigrant from the Ukraine, a job as an office clerk. Over the years, Harold taught Irina about the business world and helped Ms. Danilevskaia improve her English. In 1994, Harold brought Danilevskaia to a business meeting in Kiev, trusting her to translate during the meeting and relying on her assistance. (Ex. E at HB2).  Ms.  Danilevskaia tributes this opportunity as giving her the confidence and courage to advance her career. Ms. Danilevskaia particularly notes that having Harold's support as a woman and an immigrant in the "men's world" of the auto industry

---

[2] CAED is 501(c)3 organization created to support automotive education programs in the Tri-State area.

was a personal boon and she thinks of Harold as a father figure, teacher and mentor. (Ex. E at HB2)

Victor Almonte, a thirteen-year employee of Major World, recalls how he advanced to the position of Sales Manager because Harold "offered me a complete training in the dealership industry" (Ex. E at HB7). Mr. Almonte notes that through Harold's training, support and encouragement his professional growth allowed him to provide for his family while also spending time with his children.

Richard Mohan, an immigrant from Trinidad, began working at Major World in the lot preparing cars. Harold took notice of Mr. Mohan's knack for working with the vehicles. Taking Mr. Mohan under his wing, Harold began taking Mr. Mohan to auto auctions and taught him the how to inspect and bid on cars. Under Harold's guidance, Mr. Mohan has developed marketable jobs skills and made a career for himself which has allowed him to buy a home for his wife and two children. (Ex. E at HB5). Mr. Mohan calls himself "one of [Harold's] many accomplishments" and believes Harold "teaches the things in life that lead to success."

### c.      NYPD Law Enforcement Explorers Program

Growing up in hardscrabble Brooklyn, and later teaching in Bedford Stuyvesant in the 1970s, engendered in Harold the importance of encouraging "at risk" youth to take pride in themselves, their communities and embrace the sense of self-worth that comes from hard work.

The NYPD Law Enforcement Explorers Academy, a career-oriented program, encourages civic duty through programs aimed at strengthening the ties between the community and local police. Young men and women who join the program gain life skills, character development, physical fitness and leadership experience through hands on training and community service projects. Over the past ten years, Harold has attended many Explorers' leadership events and felt

16

great joy and pride interacting with the enthusiastic Academy members.

Over the years, Harold and Bruce would fund about 200 children for a summer camp program through the Explorer Program.

Along with monetary donations to the Explorers program, Harold, together with his brother and son-in-law, raise support for the program by sharing their passion and interest with friends and professional contacts. In June 2016, Harold was humbled and honored to receive a Distinguished Service to the Community Award from the Explorers program. Despite these accolades, Travis Smith, Director of the Explorer Academy, is grateful for the Bendells' decade long support and notes "what strikes me the most about them is their willingness to give generously without concern for recognition or acknowledgement." (Ex. E at HB38)

Tragically, in June, 2018, 15-year-old Academy member Lesandro "Junior" Guzman-Feliz, was stabbed to death outside a bodega in the Bronx by a street gang in a case of mistaken identity. While no amount of money could ever bring Junior back to his family, this tragedy strengthened Harold's resolve to support the Academy and together with his brother, Harold made a generous donation in the wake of Junior's murder. Mr. Smith notes that because of the generous contributions by the Bendells, they have made it possible for countless New York City kids to attend the Academy free of charge. (Ex. E at HB38).

### d.    The Church of Sts. Philip and James Charity Work

For over a decade, Harold and his brother Bruce, have supported the Sts. Philip and James Church and School located at 1160 East 213th Street, Bronx, New York. The Bendells built the school a computer lab, installed a security system in the school yard, and have created a scholarship program for underprivileged students. (Ex. E at HB40).

Harold and Bruce have also provided free repairs to a fleet of ambulances to be used at the

WA-JO Memorial Medical Center in Uganda, East Africa. (Ex. E at HB40).

Harold's personal history, background and characteristics are crucial considerations in his sentencing and warrant a sentence of probation. *See Gall*, 552 U.S. at 52 (2007) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.").

In assessing Harold, this Court faces an individual whose life has been nothing short of extraordinary in surviving tragedy, achieving financial success and maintaining a commitment to service of those in need, whether they be friends, family or members of the community. While Harold's personal history does not negate his offense, it warrants the Court's exercise of leniency to account for a rich history of compassion to others and service not just by economic means but by his time and efforts.

In *United States v. Serafini*, the Third Circuit affirmed a 3-level downward departure in a pre- *Booker* sentence based on prior charitable work and acts of generosity by the defendant. *See* 233 F.3d 758, 762, 773-74 (3d Cir. 2000). The *Serafini* Court found the departure was appropriate in:

> Those weren't acts of just giving money, they were acts of giving time, of giving one's self. That distinguishes Mr. Serafini, I think, from the ordinary public servant, from the ordinary elected official, and I had ample testimony, today, that says that Mr. Serafini distinguishes himself, that these are acts not just undertaken to assure his re-election, but are taken because of the type of person he is....

*See id*. at 775.

In *United States v. Tomko*, the Third Circuit affirmed a below-Guidelines sentence of probation for a defendant convicted of tax evasion, where the variance was granted in large part because of defendant's "involvement in exceptional charitable work and community activity."

*See* 562 F.3d 558, 563 (3d Cir. 2009). The district court in *Tomko* placed substantial weight on the fact that the defendant's charitable acts including not only donating money but giving of his "personal time," including participating in holiday gift drives and his work with Habitat for Humanity. *See id.* at 572.

It is not uncommon that courts when presented with an individual who has exhibited dedication to the well-being of others have granted downward departures (in the pre-*Booker* era) or variances because, as here, a defendant has exhibited dedication to the well-being of others and a notable record of personal acts of generosity and compassion. *See, e.g.*, *United States v. Campbell*, 765 F.3d 1291, 1300 (11th Cir. 2014) (granting a significant downward variance because of the defendant's "life of service and his compassion for his family but, more importantly for the court, for his fellow man as well.") (internal quotations omitted); *United States v. Cottingham*, 318 Fed.Appx. 159, 162 (4th Cir. 2008) (in a tax evasion case, affirming a downward variance to a six-month sentence based on defendant's "lack of a prior criminal record, the extent of [his] community service, and the outpouring of support for [him]."); *United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (affirming downward variance based in part on defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others"); *United States v. Weisberg*, 297 Fed.Appx. 513 (6th Cir. 2008) (affirming a 72% downward variance against defendant convicted of tax evasion).

Over the course of his life, Harold has evidenced concern for others less privileged by not only giving financially but also giving of his time. These acts should be given consideration by the Court.

**B.      A Sentence of Probation Would be "Sufficient, But Not Greater Than Necessary"**

Given all that Harold has endured since 2010 when this matter became the attention of

the Government, a non-custodial sentence will comply with § 3553(a)'s mandate that the sentence be "sufficient, but not greater than necessary," to comply with the purposes of sentencing. *See* § 3553.

This case has hung over the head of Harold and Bruce for 7-8 years. And, the matter has received considerable media attention in both the local media and the automotive industry. Where Harold and Bruce had been well known and respected in the industry, they were now seen in a different light. *See, e.g., United States v. Schuster*, 2002 WL 31098493, at *1 No. 01 Cr. 67 (S.D.N.Y. Sept. 19, 2002) (sentence of probation where defendant had been severely punished in part because of his disbarment as attorney).

In addition, Harold and Bruce's guilty pleas have required them to relinquish the control of Cityworld Toyota as the NYC Department of Consumer Affairs will not allow them to be controlling managers of the dealership.

But perhaps the most significant basis for a sentencing Harold to a non-custodial sentence is he and Bruce's extraordinary acceptance of responsibility for their crimes.

### 1.     Harold's Extraordinary Acceptance of Responsibility

 It is now well settled that extraordinary acceptance of responsibility is recognized as a bases for a downward departure from a guidelines sentence. This matter is such a case. Indeed, Harold, and his brother as well, went well beyond what a defendant would be expected to do as acceptance of responsibility, showing their remorse in their conduct and how they have owned the consequences of their actions.

While the PSR claims no grounds for a variance exists this position is grossly in error. The PSR mischaracterizes or provides no analysis to the unusual lengths that the Defendants went in cooperating with the Government in an investigation that lasted about 8 years. The "heartland" of

cases in which § USSG 3E1.1's two-point reduction for acceptance of responsibility is applied consists of "cases in which a defendant admits the factual basis of his or her conduct, recognizes his or her guilt, pleads guilty, and changes his or her plea sufficiently prior to trial so that the government is able to avoid preparing for trial."

What takes this case outside the heartland is that it involves not only Harold's acceptance of responsibility by pleading guilty but: 1) Harold's participation in numerous proffers with the Government since 2010; 2) the hiring of FTI Consultants after an agreement with the Government to conduct forensics for areas of interest in the Major companies and the sharing of the FTI findings with the Government[3]; 3) the Bendell's disassociation, at the request of the Government, from MAC in 2014 by selling a substantial interest in the companies to Adam Cohen (Harold's son-in-law) and transferring the remaining interest to trusts outside their control for the benefit of their families; and 4) the payment of all of the restitution agreed upon in the Plea Agreement.

The Bendell's extensive actions, constitute an extraordinary acceptance of responsibility. *United States v. Petrelli*, 306 F. Supp. 2d 449, 451 (S.D.N.Y. 2004)(Court accepted probation's recommended a three-level departure in the offense level from level 19 to 16 based on Petrelli's extraordinary acceptance of responsibility in disclosing his offense and for making substantial restitution); see also *United States v. Kouzios*, 15-cr-0065 (Glasser, J.) (probation recommended downward variance for extraordinary acceptance of responsibility.)[4]

---

[3] The PSR's passing mention of a an "audit" is misleading about the origin of FTI's work. First, it wasn't an audit. Rather, it was a forensic evaluation to investigate categories of issues raised by the Government. Secondly, it was the product of an agreement with the Government and conducted to work with the Government to determine the appropriate amount of tax required to be paid by the Defendants.

[4] The PSR's statement that no grounds exist for a downward variance appears to contradict the position of probation in this District. It is impossible to tell from the PSR if Probations does not believe extraordinary acceptance of responsibility is a ground for a variance or that it was not present here. Both conclusions would be wrong.

Indeed, it is hard to imagine any greater way that individuals such as the Bendells could have acknowledged their wrongdoings and actively participated in the Government's requests to atone for their transgressions.

First, at the start of the investigation into his and Bruce's conduct at Major in 2009, Harold cooperated with the IRS and U.S. Attorney's Office. He agreed to multiple proffer meetings and provided detailed explanations of MAC business, Orsaris' role at Major World, and explanations of the decisions that lead to the transactions in issue here.

Even after Harold was advised that he would not be getting a 5K1 downward departure application from the U.S. Attorney's Office, Harold continued to cooperate and engaged in a series of meetings to address issues raised by the Special Agents of the IRS. This cooperation, particularly after being told there would be no application for a downward modification by the Government is a basis for a downward variance. *See United States v. Robinson,* 741 F.3d 588, 600 (5th Cir. 2014) ("a court may consider evidence of cooperation under § 3553(a)(1) even in the absence of a § 5K1.1 motion"); *see also United States v. Landrón–Class,* 696 F.3d 62, 77–78 (1st Cir. 2012)*, cert. denied,* 133 S. Ct. 1621 (2013)*; United States v. Massey,* 663 F.3d 852, 858 (6th Cir. 2011); *United States v. Leiskunas,* 656 F.3d 732, 737 (7th Cir. 2011)*; United States v. Doe,* 398 F.3d 1254, 1260–61 (10th Cir. 2005)*.*

In 2013, the Bendells at the behest of the U.S. Attorneys' Office, agreed to hire FTI Consultants to conduct a forensic analysis of areas of concern to the Government. Probation in this District has recognized lesser assistance in an investigation as extraordinary acceptance of responsibility. See *United States v Kouzios*, 15-cr-0065 (See PSI Report ¶ 75).

The review of MAC's records and discussions with its employees was an enormous undertaking. Frankly, the Special Agents would more likely than not have been able to undertake

such a review. Indeed, as shown by Lindi Jarvis of FTI, who supervised the analysis, FTI spent over 3,000 hours conducting the review. FTI's consultants even met with the Special Agents and the AUSA to discuss their findings and identify other areas of Government interest. See, Ex. D.

MAC, at the direction of Harold and Bruce, spent about $960,000.00 in fees with FTI. Eventually, it was FTI's analysis that led to the loss and restitution amounts in the Plea Agreement.

In 2013, the Government suggested that it was in the best interest of all involved for Bruce and Harold to divest themselves of their ownership interest and involvement of MAC. At the time, Bruce held all of the stock of the MAC. Despite the ownership of the stock, Bruce and Harold shared in the profit of the company equally.

Harold and Bruce agreed to divest themselves of their interests in and operational control of MAC. The structure of the transaction was complex since MAC was a multi-layered entity. The result was a buy out of Bruce's interest by entities controlled by trusts for Harold and Bruce's children, as well as consulting agreements for Bruce and Harold. The assets of MAC were sold to MWA, which is owned, in part, by Adam Cohen.

Since the divesture, Harold has maintained a consulting relationship with MWA limited to the purchase of used automobiles through a small company he operates in Puerto Rico. This consultancy was contemplated by the divestiture transaction. And it allowed MWA to benefit from Harold's extraordinary talent in buying used vehicle at auctions.

Harold's walking away from the company he built 4 years before entering a guilty plea was a painful step in response to an unusual request by the Government – that the owner of a business resign from a company he built to resolve a tax. But Harold recognized that it would be in the best interest of his employees, his children, and the future of MAC, and agreed. The Court would be hard pressed to find other examples of such extraordinary and comprehensive acceptance of

responsibility in a criminal tax case. Harold's divesture of his interest and role in MAC is worthy of significant consideration in mitigation.

Finally, Harold and Bruce agreed to pay substantial restitution even before entering their pleas. This restitution significant, was substantially favorable to the Government. This was particularly so based on applying the 28% tax rate for the Orsaris employment tax.

## C.   The Need to Avoid Unwarranted Sentencing Disparity

Finally, and importantly, to avoid a substantial sentencing disparity, the Court should grant a downward variance to a non-custodial sentence. *See* § 3553(a)(6). Defendants with backgrounds and circumstances like or less compelling than Harold's, who were convicted of violating § 7206 or other tax-related offenses, commonly receive sentences of probation.

 For example, examining local proceedings, we have identified many cases in the Eastern and Southern Districts of New York where defendants convicted of violating 26 U.S.C. § 7206(2) and other similar offenses received downward variances to non-custodial sentences. See, Ex. F.

While many cases in which non-custodial sentences were imposed have some characteristics like Harold's, we were unable to find any that had the acts of charitable work coupled with the extraordinary acceptance of responsibility and cooperation with the Government present in this case. Frankly, Harold and Bruce have went beyond what defendants would ordinarily do to make things right. Some of these cases are worth a closer look. And one in particular is very similar.

In *United States v. Kouzios*, 15-cr-0065, a case very similar to the instant one, the defendant, who had come to the United States as a child and built his own business, pleaded guilty to § 7206(1) in which he admitted to a tax loss of $1,460,366.00. (see Def. Sent. Memo. pg. 26 attached as Ex. G).  Mr. Kouzios assisted the Government in "analyzing the facts and computing

24

the amount due and paid all his restitution prior to sentencing." *Id.*

Unlike Probation here, the PSR noted such actions as extraordinary acceptance of responsibility and a potential ground for downward departure per policy statement 5k2.0 *Id.* at 27. In addition, like Harold and Bruce, Mr. Kouzios took public responsibility for his actions. Judge Glasser sentenced Mr. Kouzios to 3 years' probation and 150 hours of community service.

Harold's case has many similarities to the factors that would lead to a non-custodial sentence in *Kouzios* but exceeds some of them. While Kouzios helped the Government understand the transactions in issue, Harold and Bruce went further and hired forensic accountants to investigate specific requests of the Government.

Secondly, Harold and Bruce paid restitution well beyond the agreed upon criminal conduct to resolve both the agreed upon criminal conduct and disputed transactions. Some of which compelling arguments existed that no tax was due. And, unlike Kouzios, who tax was personal income tax, the tax here is employment tax due to improper treatment of Osaris making him the benefit of the criminal activity.

Thirdly, at the request of the Government, Harold and Bruce divested themselves of the interest in MAC. Mr. Kouzios apparently kept working for his company. Finally, this matter has been an investigation pending almost 8 years during which it has hung over a now almost 71-year old's head.

In sum, while the Mr. Kouzios and Harold have similar circumstances, Harold has exceeded those factors that led to Mr. Kouzios' non-custodial sentence.

In *United States v. Shockler*, the defendant, Dmitry Shockler, aided in the filing of false corporate tax returns by underreporting the gross receipts for six health clinics. *See* 2013 WL 4851695, at *1. Mr. Shockler, who was 41 years old, cashed health insurance checks payable to

the clinics, but did not report the cashed checks as income to the accountant who prepared returns for the clinics. *See id.* The accountant then unknowingly underreported the total gross receipts. Mr. Shockler pleaded guilty to six counts of violating § 7206(2); the tax loss to the United States was $592,704.05 (within the guidelines range to which Harold pleaded); and Mr. Shockler's Guidelines range was 30-36 months. *See id.*

At sentencing, Judge Weinstein noted that Mr. Shockler was a hard-working individual who worked 12-hour shifts driving a taxi for several years, and who supported and cared for his mother, who had breast cancer, by "taking her to doctor's appointments, making phone calls, handling bills, and dealing with emergencies." *See id.* at 2. He also noted that Mr. Shockler "volunteered to help residents affected by [Hurricane] Sandy, demonstrating his commitment and close ties to the community." *See id.* On these facts, Judge Weinstein varied downward and sentenced Mr. Shockler to two years of probation on all six counts. *See id.*

In *United States v. Frank*, the defendant was convicted of one count of violating of § 7206(2) for assisting in the preparation and filing of a false income tax return on behalf of a corporation. *See* No. 11-cr-820 (E.D.N.Y) (DE 3, 13). The tax loss caused by the defendant was $264,664, his total offense level was 17, and his Guidelines range was 24-30 months. *See* Def.'s Sentencing Mem., *id.* (DE 11). Judge Wexler granted a downward variance to a sentence of three years' probation. *See id.* (DE 13).

In *United States v. Quinn*, the defendant was the sole owner of a clearinghouse business offering its members the opportunity to barter goods and services with one another. *See* No. 10-cr-327 (E.D.N.Y.) (DE 3). In connection with his business, the defendant was convicted of fourteen counts of § 7206(2) for failing to file Tax Form 1099s for the members of the clearinghouse, causing a tax loss of over $100,000. *See id.* (DE 13). This Court varied downward

imposing a sentence of three years' probation. *See id.*

In *United States v. Calcagno*, the defendant, an owner of a construction company, was convicted of one count of violating § 7206(1) for filing false tax returns on behalf of his company. s*ee* No. 5-cr-298 (E.D.N.Y.) (DE 37, 57). The defendant caused a tax loss of between $330,000 and $525,000. *See* Def.'s Sentencing Mem. (DE 52). At sentencing, Judge Dearie ordered the defendant to pay over $400,000 in restitution and granted a downward variance to three years' probation. *See id.* (DE 57).

In *United States v. Shin*, the defendant was the sole owner of a construction business that knowingly omitted over $5.5 million in gross receipts over three years, resulting in a tax loss of over $1.9 million *See* No. 12-cr- 182 (E.D.N.Y.) (DE 2). The defendant was convicted of one count of violating § 7206(1) and was ordered to pay approximately $1.9 million in restitution. Judge Garaufis varied and sentenced her to five years' probation. *See id.* (DE 8).

In *United States v. Singh*, the defendant was convicted of one count of violating § 7206(1) for under-reporting over $4 million in gross receipts received by his construction business. *See* Gov.'s Sentencing Mem., No 13-cr-408 (E.D.N.Y.) (DE 24); *see also* (DE 1). The defendant pleaded guilty to one count of violating § 7206(1) and caused a tax loss of over $821,000. *See* Statement of Reasons, *id.* (DE 31) at 2; *see also* (DE 24). Judge Weinstein varied downward to a sentence of three years' probation and ordered him to pay $821,342.62 in restitution. *See id.* (DE 31). Explaining his reasoning, Judge Weinstein wrote:

> General deterrence is satisfied with the sentence imposed. The sentence will send a clear message that any involvement in making and subscribing a false tax return will result in a substantial amount of restitution and probation. Specific deterrence is achieved through the impact of this conviction on the defendant's employability. It is unlikely that he will engage in further criminal activity in light of his embarrassment to the community. His behavior is abhorrent but is not in accord with his background or the values of his community.

*See id.* (DE 31) at 4.

In *United States v. Mattarella*, the defendant was convicted of one count of violating 26 § 7201 and one count of § 7206(1). *See* No. 98 Cr. 309 (E.D.N.Y.) (DE 19). The defendant owed, and was ordered to pay to the IRS, over $400,000. *See id.* He received a sentence of five years' probation, with a six-month term of home detention. *See id.*

There also are many cases outside the Second Circuit where defendants convicted of more severe offense conduct, causing greater tax loss, received non-custodial sentences. We have already discussed several such cases. In *Warner*, the defendant caused a tax loss of $5.5 million but received probation. *See supra* 34, 44. The defendant in *Olenicoff* had $52 million in civil tax liability and was also sentenced to probation. *See supra* 34.

In sum, while certainly not exhaustive, we have identified a significant amount of cases that are squarely pertinent to this Court's sentencing of Harold. These cases, particularly *Kouzios*, show that a non-custodial sentence would be consistent with those handed down in this this District and the neighboring Southern District of New York.

## CONCLUSION

In light of the foregoing, the Court should sentence Harold to a non-custodial sentence which is sufficient but not greater than necessary to achieve the purposes of 18 U.S.C § 3553(a)

Dated: Lake Success, New York
     April 9, 2019

                    Respectfully submitted,
                    HARFENIST KRAUT & PERLSTEIN, LLP

     By:       *S/ Steven J. Harfenist*
                    Steven J. Harfenist
                    *Attorneys for Harold Bendell*
                    3000 Marcus Avenue, Suite 2E1
                    Lake Success, New York 11042
                    Tel: (516) 355-9600
                    SHarfenist@HKPLaw.com