# Appendix

**Defendant Harold Bendell's Objections to the Pre-Sentence Investigation Report**
**Criminal No. 17-CR-585(JS)**

The following constitutes Harold Bendell's specific objections, corrections, clarifications and updates in response to the December 13, 2018 Pre-Sentence Investigation Report ("PSR"), which Mr. Bendell has reviewed and discussed with counsel.

## THE OFFENSE CONDUCT

**Paragraph 3**:

This paragraph inaccurately states that Harold allowed Chris Orsaris ("Orsaris"), the general manager of Major Auto during the relevant period, to "charge personal expenses on his personal credit card but have Major Auto pay the bill." This statement is incorrect. While Orsaris did, on occasion seek reimbursement for claimed business expenses on his personal credit card, Orsaris, without permission from Harold or Bruce Bendell, paid his personal American Express bills through Major Auto. He specifically did this by using the on-line bill paying. Because Major Auto had large monthly charges to American Express for business purposes (particularly advertising charges), Major Auto did not learn Orsaris' theft until his arrest.

**Paragraph 4:**

The claim that Harold and Bruce "In order to accomplish the tax fraud, used different accounts to maintain their books and records and to prepare their federal and person income tax returns" is incorrect. Putting aside that Probation probably meant "accountants" as opposed to "accounts" the fact that two different accounting firms performed services for Major Auto and the Bendells played no role in the crimes to which they have pled. Probation's statement is purely conclusory without any basis as to how the use of the different accountants would affect the misclassification of Orsaris as an independent contractor as opposed to an employee. Probation is

1

simply wrong. As part of Orsaris' plea, he agreed to restitution to Major Auto in the amount of $14,337,412.25. [1] Included in this amount are the American Express charges he stole. How can Probation now claim that Harold and Bruce allowed Orsaris to steal from him if he acknowledged it was his theft and agreed to pay restitution?

## PAYMENT OF CASH WAGES TO MAJOR AUTO MANAGER

**Paragraph 5**:

Probation mischaracterizes this section since its substance has nothing to do with "Payment of Cash Wages to Major Auto Manager." There is no allegation or evidence in this case that the manager in question was paid in cash. For accuracy, this section should be entitled "Payment to Major Auto Manager."

Putting aside its misleading title, the paragraph inaccurately claims that Bruce, or Harold, knowingly paid the personal American Express charges incurred by Orsaris. This position is patently false. Orsaris's massive abuse of the corporate American Express account was part of Orsaris's scheme to embezzle from Major World. Neither Bruce nor Harold were aware that Orsaris was charging personal expenses on the company's credit card and then covertly having the company pay for them. Orsaris was able to commit this fraud against Major World because Harold had given him check writing authority and he abused that authority to approve and pay the American Express charges.

There is no evidence whatsoever that Bruce or Harold approved or authorized this conduct - which would contradict Orsaris plea and sentencing.

---

[1] While Probation notes that Orsaris was required to pay restitution, conspicuously absent from footnote 1 is that the restitution is due to Major Auto.

2

**INSURANCE KICKBACK SCHEME**

**Paragraph 7**

This paragraph inaccurately describes the identified conduct. The paragraph should be modified to reflect accurately that the kickback arrangement with Esquire Insurance was conceived and put into action by Orsaris who shared the payments with Harold and Bruce. Harold objects to the PSR's claim that Esquire paid $30,000 per month to Orsaris. Rather, he received approximately $30,000.00 per year.

To the extent that Esquire indicated that it paid a larger sum, it should not be surprising to the Court that Orsaris stole it and did not share it with Harold and Bruce. Most importantly, the PSR should reflect that for the years in question, 2007, 2008, and 2009, Harold recorded approximately $30,000 a year in miscellaneous income on his personal income tax returns. *See Harold Bendell Tax Records* at Exhibit C. For this reason, the Esquire payments were not made a part of the criminal tax loss calculation in the plea agreement for this matter.

**NON-DECLARATION OF INCOME**

**Paragraphs 8-11**:

These paragraphs improperly and inaccurately describe the non-declaration of income. First, Harold did not keep a bag of cash in the ceiling. Rather, cash was kept in a safe. Where Probation received this information is unknown to Harold. It is ludicrous to think that Harold would leave cash in the ceiling of Major and that some other employee would know about it.

Secondly, paragraph 9 creates the impression that every vehicle sold by the company at auction was recorded on the books as being sold for $1.00. That is simply wrong.

Third, paragraph 11 is a conflation of two different transactions and is wrong. The amounts identified in the paragraph had no adverse tax impact to the Government. First, Harold did not put personal expenses through the business. Secondly, and more importantly, the "amounts paid" to the extent they related to the payment of advertising by MAC for another company owned by the Bendells did not have any tax impact since they were legitimate business expenses which would be deducted by the "private" companies." Put simply, there was no tax loss related to these transactions.

Finally, none of the conduct in these paragraphs were part of Harold's guilty plea. Instead, they fall into the restitution component of the agreement with the Government which, despite Probation's error, is not used to calculate the tax loss for guidelines purposes. These inaccurate and unsupported statements need to be removed from the PSR since they attempt to create an impression of massive multiple tax schemes where non-exist.

## LOSS SUMMARY

**Paragraph 12**:

Harold objects to the PSR's "Loss Summary" as it misunderstands the structure of the plea agreement, the distinctions made by the parties between the smaller criminal tax loss figure and larger restitution amount and the clear evidence that certain of the transactions simply were not criminal conduct by Harold or Bruce. Instead, they were more akin to tax issues usually treated civilly.

The plea agreement includes as restitution claims of tax which are disputed by the parties but which *they both agreed did not derive from criminal conduct*. In order to resolve the case, the parties agreed to include these disputed calculations in the restitution total, even though they would

be ineligible to be counted as criminal tax loss. The distinctions between how the six categories of conduct listed in ¶12 of the PSR were addressed by the Harold and Bruce and the Government are essential to understanding the Plea Agreement.

First, the criminal conduct in this case involves only (i) the improper payments to Orsaris's corporate entity and (ii) other cash compensation payments made to Major World employees. This conduct, which formed the basis of the guilty plea, caused Major World to file inaccurate IRS Form W-2s and Form 1099s for these employees. The tax loss for this conduct is itemized in the two rows of the chart in ¶12 entitled "Commission Payments to Orsaris's Companies," and "Cash or Unreported Employee Compensation." When the figures in these rows are totaled and multiplied by 28% (income tax rate), the resulting sum is $1,384,433.40. That number corresponds to the "Employment Tax" chart total contained in Attachment A "Restitution," on page 8 of the Plea Agreement. This number also forms the basis for the Tax Loss Guideline range of greater than $550,000 but less than $1,500,000, *see* § 2T4.1(H), that the parties stipulated to on page 3 of the Plea Agreement.

Second, to resolve non-criminal tax disputes (and therefore not "relevant conduct"), the parties agreed to include additional monies as part of the restitution in this matter. The remaining four "Categories of Loss" listed in ¶12 of the PSR: (1) AMEX charges; (2) Esquire kickbacks; (3) Unreported checks; (4) Public versus Private expenses form the basis of this calculation. As stated, the AMEX charges (Harold had no knowledge of Orsaris's theft) and Esquire Payments (Harold recorded the cash he received on his personal tax returns) would not constitute criminal conduct.

Third, the "Public versus Private Expenses" category also yields no discernable tax loss because: (i) there is no dispute that the taxes were picked up by one or the other entity; and (ii) MAC was no longer even a public company by 2008.

5

The final category, "Unreported Checks" could not be calculated with any real accuracy. This category was expressly excluded from the criminal loss calculation since it was an extrapolation. If these four categories are summed and multiplied by 28% (tax rate), the total is $1,388,622. This figure corresponds to the additional restitution contained in the "Corporate Income Tax" chart on Attachment A (on page 8) to the Plea Agreement. Demonstrating the intent of the parties to treat this number separately from the criminal tax loss, this figure is not included in the Base Offense Level calculation contained on page 3 of the Plea Agreement.

Probation's claim the guideline loss and restitution numbers ignores the plea agreement and does not take into account the dramatic differences in the categories.

Accordingly, the PSR should be revised to comport with the tax loss calculation contained in the plea agreement.

**Paragraphs 13 and 76**:

Harold objects to the PSR's conclusion that "the tax loss to New York State represents other criminal conduct." PSR at ¶1. This conclusion, as justification for an upward modification, is based on pure speculation. The claim that "it is likely that a loss resulted to New York State" is without any factual or legal basis. However, the PSR goes on to concede that the "[IRS] agent was unable to provide [supporting] information." *Id.* Further, the IRS agent stated that "not all of the fraud benefitted the defendants, as some aspects of the scheme involved cash payments to employees." *Id.*

Nonetheless, the PSR concludes that there was tax loss to New York State which "represents other criminal conduct." The PSR then uses this as the basis of an upward departure. No evidentiary support exists to justify this conclusion. No investigation of state tax loss was ever

conducted. No calculation of alleged state tax loss was offered by the government in this case. In short, this paragraph should be struck from the PSR as unsupported, prejudicial and contrary to the spirit, intent and stipulations contained in the Plea Agreement.

**DEFENDANTS' PARTICIPATION**

**Paragraph 15**

Harold objects to this paragraph on the following grounds: (1) he disputes the guideline loss calculation; and (2) the "sophisticated means" enhancement levied by the PSR is misapplied and unwarranted. Specifically:

(1) Guideline loss calculation: For the reasons previously discussed, the PSR's loss calculation is inaccurate and contrary to the terms of Mr. Bendell's plea agreement. It includes loss amounts for conduct that the USAO either decided wasn't criminal conduct. Accordingly, the PSR's loss calculation should be discarded and the Court should find a loss amount consistent with the stipulation contained in Mr. Bendell's plea agreement.

(2) "Sophisticated Means": Contrary to the terms of Mr. Bendell's plea agreement, the PSR applies the "sophisticated means" enhancement pursuant to USSG 2T1.4(b)(2). The PSR justifies the enhancement, essentially, on the basis that "part of the offense involved the payment of cash to an employee's shell compan[y] to avoid the payment of taxes." This is an improper basis to ground this enhancement.

Initially, the PSR's statement that there were cash payments to the "office manager" is simply wrong. While Harold, Bruce and Orsaris split cash payments from Esquire, they did not pay him in cash- Orsaris arranged the transaction.

7

Secondly, there was nothing sophisticated about the current offense. The alleged "shell company" that Orsaris used to receive a portion of his compensation was his wife's consulting business. The corporate entity was originally created, created by Mrs. Orsaris's who, for a time, worked as a consultant for Major Auto. Major Auto would pay this entity for consulting work performed by Mrs. Orsaris. After she stopped performing consulting services for Major Auto, Mr. Orsaris asked Harold if Major Auto would now pay a portion of his compensation to this corporate entity. Harold agreed to this arrangement. While improper, there was nothing "sophisticated" about the structure of these payments. Orsaris and Harold did not create a fictitious entity for the purpose of committing tax fraud, to the contrary they used a pre-existing entity that was easily identifiable with Orsaris. These factors are contradictory to a "sophisticated means" enhancement.

In *United States v. Brown,* 877 F.Supp. 2d 736 (D. Minn. 2012), the district court declined to apply the enhancement in a wire fraud case. The Government had argued that the sophisticated means enhancement should apply because the defendant had created a South Dakota LLC, opened separate bank accounts at multiple banks, solicited funds from victims in at least four states and forged documents to orchestrate the fraudulent scheme. The district court rejected application of the sophisticated means enhancement (under USSG 2B1.1) because the court found that the defendant did not "create fictitious entities, corporate shells, or offshore financial accounts" for the purposes of committing fraud; rather she "opened readily identifiable accounts at local banks." *Id. at* 752. Accordingly, the court found that the fraud was easily detectable by authorities so nothing particularly sophisticated occurred to hide it. *Id.*; *see also United States v. Garcia,* 939 F. Supp. 2d 1155, 1202 (D.N.M. 2013) (rejecting the application of sophisticated means enhancement under USSG 2B1.1 on basis that the bank fraud was not committed in particularly complex fashion that made detection of the offense difficult).

8

For the "sophisticated means" enhancement to apply, "the guideline is clear: It is not enough for the means used in a scheme to be 'complex' or 'intricate'; rather, the means must be 'especially' so." *United States v. Hulse,* 989 F.Supp. 2d 1224, 1226 (M.D. Ala. 2013) (applying 2B1.1). That is, "the level of complexity or intricacy must set that particular scheme apart from ordinary schemes, and even ordinarily complex or intricate schemes. The reasoning behind this heightened requirement is obvious. The essence of fraud involves deceit or deception . . . More likely than not, some complexity will always be required to carry out such deceit. If the only requirement to apply this enhancement were some complexity, nearly every fraud would qualify. Therefore, to assure that this guideline does not result in a defendant being punished twice for fraud, the drafters of the guidelines restricted the enhancement to only those schemes that are especially complex or intricate." *Id.* at 1226-27.

Under this standard, Harold and Orsaris's actions cannot fairly be viewed as employing "sophisticated means." Applying this enhancement to Bruce under these circumstances is, therefore, both improper as a matter of facts and law. In this matter, neither Harold nor Orsaris created any fictitious entities, but rather utilized a readily identifiable company (i.e., Orsaris's wife's company) to achieve the tax fraud. By merely having a portion of Orsaris's salary paid into the wife's consulting company, Harold and Orsaris put together a very simple, and not all that uncommon, type of tax dodge.

**ADJUSTMENT FOR ACCEPTANCE OF RESPONSIBILITY**

**Paragraph 19**:

Harold objects to the last line of this paragraph which states: "At the request of Defense Counsel, the probation officer asked no questions regarding the instant offense during the presentence interview." That statement is incorrect.

Defense counsel made no such request and placed no limitations on the interview. Mr. Bendell was prepared to answer any questions regarding the instant offense. The fact is that during the presentence interview the Probation Officer, of his own volition, did not ask Harold any questions about the offense conduct. That was his choice. The statement is simply false.

**OFFENSE LEVEL COMPUTATION**

**Paragraphs 21-30, 64:**

For the reasons identified above Harold objects to: (a) a base offense level of 22 (based on a loss calculation exceeding $1.5M but not greater than $3.5M) rather than the base offense level of 20 (based on a loss calculation exceeding $550,000 but not greater than $1.5M) as provided for in the plea agreement; (b) the application of the 2-level sophisticated means enhancement; (c) the failure to apply the global resolution one-level reduction, per Policy Statement 5K2.0, as provided in the plea agreement at Paras. 2&3. Accordingly, the Total Offense Level should be 16.